All right, the first case we're going to hear is United States v. Simmons and Mr. Carpenter, when you're ready, we'll hear from you. Thank you, Judge Niemeyer, and may it please the court. I want to begin today by focusing on the money laundering convictions in this case. This court should reverse those convictions because they present the same merger problem that led this court to reverse convictions in the recent Cloud and Abdelwahab cases. As in those cases, the money laundering convictions here present a merger problem because they are based on payments for the essential expenses of the underlying fraud scheme. In this case, that fraud was a Ponzi scheme. And in a Ponzi scheme, the payouts to early investors, like those charged as money laundering in Counts 3 and 4, are the heart and soul of the fraud. Without those payments, and more specifically, without the promise to make those payments that was contained in the investment contracts that each investor signed before investing, none of the investors would have participated in the first place. There would have been no fraud. The fact that the money laundering charges present a merger problem in this case is apparent from the face of the indictment itself. If you look at Count 2, which is the wire fraud count, at Joint Appendix page 42, it alleges that Simmons devised a scheme and artifice to defraud, one of the key elements of wire fraud, that included, quote, wiring Ponzi payment to investors and their intermediaries. And these are the same payments to investors that form the basis. If you take the scheme against the elements of the offense, you need a misrepresentation or some kind of inducement to have the investor pay you the money, give the money to him, and give the money to him by means of some wire fraud or mail fraud or whatever. The crime is completed when Simmons receives that money. He can now be indicted. He's received money under fraudulent pretenses. He now takes that money and sends it out to somebody else for other purposes, to carry on the Ponzi scheme. But he's not tried for a Ponzi scheme. He's tried for wire fraud. And it seems to me, in cloud, the court made that distinction, that if it's given to the employees to have them carry on the function, the participants is, I think, the word to use, then that's the expense of the fraud itself. But if the money received is flipped, and that distinction was made in cloud, there is evidence that cloud used the profits from his previous flips to finance additional purchases. Specifically, money attorney John Lee testified that cloud left monies he acquired from previous closing at Lee's trust account and later used those monies to buy the properties underlying count six. And the court said that those were not the use of proceeds. That was money laundering. And, of course, that's the distinction we made in Halstead, is that once the health care fraud was complete and the money was received, then how they used the money thereafter to launder it creates a second account. And, of course, the whole merger doctrine, the idea is not to punish you twice for the same conduct. That's where I'm taking initially now. I don't want to be too conclusive. I want you to address it. But that's where I see the distinction. And, of course, this is a difficult area, and I think this is your best argument, too, I must say. Thanks, Judge Niemeyer. I think there are two responses I would have to that, one based on cloud and the second based on Abdu'l-Wahhab. The first, with respect to cloud, the language you quote from that case is from the dealing with the conspiracy to commit money laundering count. Well, he says, Judge Diaz says that that's one aspect. But then he says also the substantive aspect of it. He goes on very quickly to talk about the substantive aspect of using the flipped money for another transaction. He does discuss both. And in cloud, they deal with both the conspiracy count and the substantive counts. On the substantive counts, they reverse because of a merger problem. And what I think you have to do under cloud and what you should do in this case, when you're not dealing with a broad conspiracy, when you're dealing with specific alleged specific instances of money laundering, you look at those particular transactions and ask whether those transactions represent expenses or whether they somehow represent profits. I think to do the merger analysis. It's a little narrower than that. As far as we've gone and the Supreme Court's gone, is the expenses have to be to participants in the conspiracy. I don't think that will. Abdullahab rejects that position. The payments there were not made to a participant in the conspiracy. They were made to a sales agent who worked for ANO. There's no indication in the opinion in that case that he was a co-conspirator in the case. Nothing in the decision relied on the fact that he was a participant. And that brings me to the second point. I think this case is really on all fours with Abdullahab because the government advanced the exact same argument that you've sort of articulated here, which is the fraud in Abdullahab, they said, the government argued, was complete when the agent went out, enticed an investor to buy ANO's investment product, and the investor paid in. At that point, the government said you could have charged the mail fraud count in that case and we're all done. And it doesn't matter whether later down the road ANO ends up paying the expense to the sales agent by paying the commission that they're owed or not. The government said that's irrelevant. But the court rejected that position and said what you have to look at is the promise that induced that sales agent to act. And Abdullahab, ANO made a promise to that sales agent, if you go out. That's the same. The distinction was made by Justice Alito in the Santos case. He said this and we relied on that in cloud and says he described the difficulty of distinguishing between payments to participants who expect to receive certain amount of their services, whether or not the operation is profitable, and payments to those who expect to receive certain percentage of gross revenue, perhaps even addition to the salary. The idea is to carry out the fraud, you have expenses. And normally those expenses come up front. But even if they come after the fact, they're still expenses. But the idea of expenses to your participants, but the idea of sending that money out again to seed further transactions is money laundering, because that money is now a transaction that looks legitimate. Well, with all due respect to Justice Alito, there were five Supreme Court justices who voted against him in that case. And that distinction didn't carry the day there, and it wasn't relied on by this court in cloud and Abdullahab. Abdullahab, to the extent that there was debate about whether that should be accepted, Abdullahab rejects it by finding a merger problem with a payment that doesn't go to a participant. There's no indication, again, in the Abdullahab decision that the sales agent was somehow criminally conspiring. I mean, the case involved sales agents all around the country. Well, the identity of the recipient is not the key thing. That's what you're saying. Exactly. It's the function of the recipient. So if paying money to a recipient is the equivalent of, say, in this particular scheme, buying a computer, that is as much an expense of the conspiracy as buying the computer would be. Exactly, Judge Gibman. That's exactly correct. The identity of the recipient isn't the key inquiry under. If you look at what the court decides in Abdullahab, it looks at the function of the promise that led to the payment. In that case, the promise to the sales agent is what enticed that sales agent to go out and sell A&O's policies to investors. Here, the promise made to these investors in this signed binding investment contract that they would be able to withdraw their funds, subject to the terms and conditions of that contract, is what led them to provide money to Black Diamond and to Mr. Simmons in the first instance. Without that promise, there would have been no fraud. They wouldn't have participated. So the follow-through on that promise by making those payments to the investors upon their request is the essential core expense of this fraud scheme. Well, the government helps you along by putting, as you've pointed out, in the complaint that this is a Ponzi scheme. What if the government had never characterized this as a Ponzi scheme, never argued it was a Ponzi scheme? Certainly you can have mail fraud and wire fraud without money laundering being part of the offense, right? That's absolutely true. And what we look at under Cloud and Abdu'l-Wahab is not one instance of the fraud. It's certainly true that you could have a single instance of mail fraud or a single instance of wire fraud that would then be distinct. But here, regardless of what the government calls it, Mr. Simmons, what was involved here was a Ponzi fraud. And you're right, the government, you know, the very first sentence of the indictment says that. What are the elements of a Ponzi fraud? Well, if you… I mean, we just look at the statute, don't we? Well, you look at the statute for the elements of a wire fraud. I think a Ponzi fraud is something that… That's all that was alleged, wire fraud under Section 1343 and 1348. Again, under Cloud and Abdu'l-Wahab, you don't look. And the same thing with Van Alstyne and the Ninth Circuit. It said not every mail fraud is going to present a merger problem. But what we do is we look at the particular facts alleged. We don't limit it to an analysis of the elements of the offense. We look at the actual fraud that was committed and ask whether the expense was essential to that overall fraud. In all of these other cases that we've had, and I guess we're only going to have X number of cases because now Congress has changed the statute, so this is a pretty limited problem, but it is a problem. The person that received was the other party of the money laundering was bad guy. Here, the people are investors. Do you make anything of that? I don't. I don't think that distinction carries the day for a couple of reasons. Because? Well, in Abdu'l-Wahab, I think that the sales agent wasn't necessarily a bad guy, in that case. There were sales agents across the country, and there was no indication in that opinion that those sales agents all knew that A&O was a sham company. It seems that they were acting on a good faith belief, at least some of them were, that this is a legitimate company with legitimate products. And nothing in that case turned on the fact that the sales agent who received the payments in Abdu'l-Wahab was a bad guy. The other thing I would say to that is the Ninth Circuit addressed this very issue. But there, I think if you read that opinion carefully, in fact the thing that's charged as money laundering is the same thing that's charged, literally the same thing that's charged as the fraud, exactly the same acts. So I think it's distinguishable from this case. Well, I think that's a tough distinction because it's a very tough distinction to draw. Because if you ask the government in this case, these very acts of money laundering also prove that there was a Ponzi fraud. As I mentioned, that's what the face of the indictment itself says. That's what the government said in its closing arguments. Can I ask you one other question? Assume that we should conclude that this argument you would prevail on, but you wouldn't prevail on your other arguments. What is the practical effect of that? The practical effect in this case is actually pretty significant. Mr. Simmons faced a statutory maximum under these four convictions of 960 months. If these two convictions come out, that statutory maximum would drop to 480 months. And he got 600 months. He got 600. And the statutory maximum? Exactly, the statutory maximum. He received 600 months for the four counts. They were ran 240 on the wire fraud, 240 on the securities fraud consecutive, then 120 on one of the money laundering counts consecutive as well. So if you agree with us on those, that the money laundering convictions come out, it would reduce his sentence by a minimum of 10 years and would also require a de novo resentencing where the guidelines would be recalculated under the fraud guideline rather than the money laundering guideline. Okay. And you're saying those are statutory maximums? Yes. The statutory maximum for each of the fraud counts, counts one and two, is 240 months. So without the money laundering convictions. The most he could get is 560 months, and he got 600. No, the most he could get is 480. I may have missed that. Right. No, it's my deficient old mind. Thank you. Thank you. Thank you. All right, Mr. Miller. May it please the court. My name is William Miller. I'm here on behalf of the United States. The district court acted within its discretion, its evidentiary rulings, properly denied Defendant's Rule 29 motion  Accordingly, this court should affirm each of Defendant's convictions and the resulting sentence. Beginning with the money laundering convictions and the alleged merger problem in this case, the government agrees that Cloud and Abdul-Wahhab are the governing precedent in this case. The way those cases have drawn the line, however, the money laundering transactions charged in this case fall outside of the merger problem that was identified in Cloud and Abdul-Wahhab. In each of those cases, the merger problem arose when there were payments for past frauds, past complete frauds, essential expenses of those frauds. In those cases, in both of those cases, the conspiracy counts survived, and the reason was that the transactions that the court identified for those conspiracy counts were to promote future frauds, which is exactly what these transactions charged in this case. I was really sort of surprised about the way the government charged this. But anyway, it did charge it this way. Part of the deal with all of these investors was that for a certain number of days, 30 days, they could get all their money back without question. Is that right? My understanding is they were not permitted to make withdrawals within the first 90 days, according to the court.  And some of them did, to test this whole scheme. It's certainly true that defendants did make withdrawals. My understanding of the ownership. No, no, no. I think that that's part of the deal, because if you look at your big chart, you know that big chart that goes on for pages and pages, there are a lot of people that are making small withdrawals within that 90-day period. I think that's right. You didn't handle the case below. I did not. And my understanding of reading the contract was that transactions were not permitted within the first 90 days. After that, you could make unlimited withdrawals? That's correct. Okay. Well, let's just assume that's the case. So some people, either before the 90-day period is up or right after the 90-day period is up, make withdrawals, testing to see if they can get it out, right? Yes. And a lot of people do that. There's $36 million worth of fraud taken here and $9 million that these people get back over the time, right? That's correct. I think there were $19 million that went out of Black Diamond, which was the head of the Ponzi scheme. And not to quibble with the facts here, it was confusing to me as well, but a lot of those payments were actually to the hedge fund managers. Right. Only $9 million went to the investors. Correct. But they got $9 million. So there's money coming back to them to encourage their future investment, if you will, right? Right. Okay. The government doesn't charge any of those initial going back and forth. It charges way down the line to money laundering counts. I wonder why that was. The government was very careful in this case to select payments that were designed to promote and, in fact, did promote additional investment. But all of these payments did that. I mean, if you look at that chart, it's really you couldn't have had the continuing scheme without these payments. The chart shows that actually approximately a third of investors actually took withdrawals in this case. Right. And the testimony was that the default was to let the money ride and to not pay regular returns. Well, I think a third is a pretty big number, and it's a pretty substantial amount of money. I mean, when I first read these briefs, I thought that we were talking about these two withdrawals of, I don't know, a couple hundred thousand dollars, less than $100,000 and a little bit more. We have $9 million withdrawn. Right. It seems to me that the withdrawals are pretty intricate to the whole scheme. I mean, you wouldn't say that we just look at these two things that you charged as money laundering. We have to look at the whole scheme, don't we? Yes, generally speaking, I believe that's true. Right. But I do think it's important that the government selected counts in here that were right in the core of promotional money laundering and that were designed to promote future fraud. But according to you, the government could have chosen any of these things, right? That's true, and there are payments in this case that do raise the issue that presented a merger problem in Cloud and Abdul Wahab, and the government chose not to charge those. And why would they have raised the issue? There were payments in this case to hedge fund managers sharing the proceeds. No, no, no, no. Leave out the hedge fund managers for now. They're not here. We're talking about the investors and the defendant here. Were there any payments that came to the investors that you would say would be mergers? Not under Cloud or Abdul Wahab, as those cases have been interpreted post-Santos. Those cases were concerned with the payments to the participants in the fraud, to the employees for the past completed frauds. And when transactions were designed to promote future frauds. But there wouldn't be – bear with me for just one more minute. Sure. The initial getting the investors to invest was a fraud, right? That was the fraud, yes. Okay. And then getting them to invest more and getting other investors to invest would also be a fraud, right? Correct, a future fraud. Well, I don't know about future. This is now, you know, a second from now is now. So I guess I don't really get that distinction. But that's exactly what promotional money laundering is designed to prevent. And in Cloud and Abdul Wahab, when you're paying the employees for their role or the participants for their role in the fraud, that doesn't have a promotional effect toward future unlawful activity. And so it is important that the government selected two transactions, the payment to James Buzluki and Till Lux, that were specifically designed and did, in fact, promote new investors, new victims coming into the crime, and new frauds with respect to these two individuals who invested additional funds. How do you distinguish this case from a bookie who pays off bets? The bookie who pays off bets, that is an essential core expense of the fraud. That was the problem in Santos. Here, and it's a fine line drawing, Your Honor, I recognize. But here, this fraud was not, these investors were not induced based on a promise of regular dividend checks or distributions monthly. And that's a distinction between this case and Van Alstyne. Well, but does it make a difference whether it's distributions monthly or at the end of the rainbow? In three years, you'll have gotten 800 percent increase. I'm not sure I follow you with that. It does make a difference, Your Honor, and that's the distinction that arose in Van Alstyne. There, the investors were told this is a sound, safe investment, and you're going to get regular monthly distribution checks. And so as Your Honor recognized, those payments of those regular checks were the exact same transaction that formed the basis of the money laundering and the basis of the mail fraud. Here, the investors were actually told that their money was at risk, and they were discouraged at one point, the testimony shows, from actually taking withdrawals. And so unlike Van Alstyne, where the court was very careful to point out that issuing distribution checks that supposedly represented generous returns on his victim's investment was a central component of the scheme to the fraud and the inducement. And the court noticed that all of the particular accounts of mail fraud for which Van Alstyne was convicted involved transmissions of checks to investors, not the misrepresentations with which the investments were induced. That's the exact opposite of the fraud we have here, where the investors were induced to participate based on promises of historical returns, and they were lulled not with regular distribution checks, but with these statements that came out showing the bogus return. Well, the payments were part of the lulling, weren't they? They may have been relevant to the scheme, certainly, Your Honor. The government says in its brief that, I don't know, some amount of months after the payments stopped, the fraud ended. But actually, it was a pretty short period, about four months. Payments began to be stopped in March 2009 is when investors were told you can't make withdrawals. That's when it began. I'm not sure. There certainly could have been withdrawals after that. There were still things going out according to the government's chart. That's correct. Well, then the payments didn't stop, did they? No. But as early as March of 2009, investors were told that they could make no more withdrawals. When were the last payments? Excuse me. I'm sorry. I didn't mean to cut you off. Okay. But it did continue for seven months. And I would argue, Your Honor, that that shows that these weren't an essential expense of the fraud. And it also, as to those two-thirds of victims that didn't take a single withdrawal, the fraud was no less complete as to those individuals as it was to the ones who did make withdrawals on an inconsistent basis and in inconsistent amounts. And turning to the indictment for a moment, if I may, page 42 of the joint appendix is where this count two arises. I think it's important to point out that the language that the defendant quoted regarding the Ponzi payments actually appears in connection with the interstate commerce element of the crime rather than the scheme to defraud. If you look at page 42, it says, transmitted by means of wire communication and interstate commerce, any writing, signal, or sound to wit, and then identifies the telephone calls and e-mails and also the wire transfers that made up the Ponzi payments. Is it the government's position that the money laundering had to be an element of the offense of the fraud in order for there to be merger? No. That's not what the court's post-Santos precedent has shown. Maybe that would be the correct answer, but that's not what the Supreme Court held. Right, certainly not. My point here was just to show that this was not connected to the scheme to defraud. It doesn't show that these were necessary expenses of the scheme to fraud, which is how the defendant characterized it. It's listed here as relevant to the element of the wire. We go look, and when we see how the government tried the case, as I say, if you go look at that chart, the withdrawals were important to the ongoing fraud, the $9 million that the investors got. And the question is not, Your Honor, whether or not they were important or relevant. Or perhaps essential. Whether or not they were essential. Right. It's hard to think that they would have gotten $30-some million if they hadn't sent back some of the millions of dollars. Particularly in light of the government's witnesses, the two people whose payments were part were the focus of the money laundering. I mean, they testified, told all their friends, they wouldn't have done this without getting the money back, blah, blah, blah. And I think, Your Honor, that testimony is particularly important to the government's point here, which is that Cloud and Abdul Wahab drew the line between payments for the completed fraud, payments that went sort of backwards, if you will. We knew we were going to have to pay these employees to go out and make commissions, versus payments that induced future fraud. And that's the core of promotional money laundering. And the government was careful in this case to select payments that were designed to, and in fact did, attract additional investment by these defendants. They were re-victimized and bringing in new investors, new victims to the scheme. This Court has never, post-Santos, said that those type of payments that are future-oriented. Well, we asked Santos, right? And Santos says that a payment at an expense of operating is emerged. That's what their language is. That's correct. And here, there were certainly expenses of operation. I'm going to say the word hedge fund manager again. But those payments to the hedge fund managers, dividing up the proceeds, paying the people who brought these investors in, those are the types of transactions that this Court has held post-Santos present the merger problem. What this Court hasn't held post-Santos is that payments that were designed to, and in fact did, bring in additional fraud. You wouldn't assert that we can narrow what the Supreme Court said in Santos. We're going by Santos, right? No, and I certainly don't think you have to in this case. But you keep saying what this Court has done. But what we have to really do is look at these facts under Santos. That's correct. And Cloud and Abdul Wahab as well. Would your position be the same if they had used some of the money to buy a computer so that they could send out fraudulent statements? Those types of expenses, Your Honor, are the type that would have been covered by Cloud and Abdul Wahab. Well, what if it happened after these people had made their investment in the scheme? I'm not sure it would change based on the timing. Well, then why did you keep? You can't say that. It's the expense for the fraud that normally would precede the fraud, even if paid after the fraud is the expense of the fraudulent scheme. If the product of the fraud produces income which you can expand for future transactions, my suggestion would be that the post-fraud would not be expenses of the fraud. That's correct. In other words, the distinction is if it is an expense whether paid before or after, which is normally a tenant, expense of the fraud itself. So if they didn't use computers on the first ten transactions and got lots of money, and then on the next ten transactions they spent money for computers, it seems to me those expenses are not expenses of the initial transaction. That's correct. That's actually where I was headed. The only reason I paused was that the timing of the payments in Cloud and Abdul Wahab was not the determinative feature. It's not determinative because it's the expense. You have to determine whether it's pre or post whether it's an expense of the fraud. Correct. And that was why I answered the question the way I did was that the timing is not determinative. What matters is whether or not it was for the past completed fraud or whether it's intended to promote future fraud. We said in utilizing monies from previous properties in Cloud to finance future purchases, Cloud was not paying the essential expenses of the underlying crime. Thus, count 27 does not present a merger problem. That's correct. And the same thing was said again in Abdul Wahab, Your Honor, where payments for commissions for complete frauds presented a merger problem while transactions, and I'm quoting, intended to promote the continuation of the investment scheme did not. That's about the same type of proposition that was said in Cloud. Correct. It's the same language. And the Court emphasized that payments of this kind did not constitute paying expenses or giving co-conspirators their share of profits. Rather, they were simply part of the deception that furthered the defendant's scheme to defraud as such there was no merger problem. What happens in Santos when they pay to the people that are engaged in the, they pay out the money after the fraud to the people that are engaged in the illegal gambling? That, Your Honor, is an expense associated with the initial transaction of participating in that gambling scheme. You know, you used the word associated. Expenses here are certainly associated with the initial transaction. Right, and I may have been unartful in that. The question is whether or not it's a necessary. And it seems to me that it's pretty close that the expenses to people that are investing, payments to people investing, are necessary to this continuing fraud scheme. That's correct. And, again, it is fine line drawing. That's correct. It is the fine line drawing that this Court is required to do in these cases. But here, the payments, if you look at this particular type of Ponzi scheme, it's a little misleading to talk about Ponzi schemes in general, but if you look at this particular Ponzi scheme, those inconsistent withdrawal payments to relatively few participants were not an essential expense like the fraud in Van Alstyne where the victims were told, your money's not at risk. You're going to get regular distributions monthly. In that case, that was an obligation of the initial fraud. Here, the defendants were told, your money's at risk. But you can get it back. We'll hear from the other side, but I think that they were told at the outset, that you can get this back either within the first 90 days or after the first 90 days are gone. That was part of the fraud. Correct, and I didn't mean to quibble on that point, Your Honor. No, I know you didn't. I think you're trying to just help me along. And I would just say here that that contractual obligation that sort of forms the centerpiece of the defendant's reply is really meaningless because the contract in this case also said that the defendant was going to invest that money in a Forex platform, and it made eight representations, none of which were actually true. And so to rely on that contract as the essential signed contract of the fraud is a little bit misleading given that it was all just a sham from the word go. The defendant never invested money in Forex and never intended to, and that was part of that signed contract as well. And to rely on the contract is a little bit misleading at this point. Well, but the whole idea of money laundering is to take ill-gotten gains and turn it into a different form, either through running it through bank accounts or buying gold or whatever, so that the bad guys can use it without getting into trouble. And that's just not what happened here. I would disagree with that, Your Honor. I think what happened here is exactly what promotional money laundering is intended to prevent, and that's taking the proceeds of your unlawful activity and promoting future unlawful activity. And that's exactly what happened here. The defendant took the proceeds of his initial fraud and used it to make payments that induced future investors and future investment. That's within the core of promotional money laundering, and it's distinguishable from the types of payments that presented the problem in Cloud and Abdul Wahab. I'd like to just point out one thing briefly, if I may, with respect to the victim testimony, and that's, in this case, I think it's evident from the record, that Judge Conrad is very careful to manage the admission of victim impact testimony, and it's telling, and no surprise, in light of how careful he was, that the defendant was only able to identify three statements in this whole trial that arguably presented a problem, and he only really realized... The victim impact stuff was just a grain of sand on the beach. Isn't that what you're saying? That's correct. And the one thing I wanted to point out that actually wasn't necessarily covered in the briefs is that in the reply, the defendant argues that with this Mary Lynn Van Horn and her statement about shoplifting, that that was an attempt by the government to elicit improper testimony. If you go back to the charge conference, there was a discussion there about whether or not they needed to give an instruction on prior convictions, and the government specifically said, we have a witness that's going to talk about shoplifting. If I may just finish my point, Your Honor. The government said, we have a witness who has a shoplifting conviction, and the defense actually said, we'll leave in the instruction. And so it wasn't an attempt by the government to run an end around. They were fronting an issue that the defendant had previewed during the charge conference. Thank you. Thank you. Mr. Carpenter? I wanted to start with one of the points that Judge Motz asked about, which is why the government indicted and charged this case the way it did. And to be fair to the government, when it indicted and prosecuted this case, it did so in 2010 on the theory that Santos should be limited to the illegal gambling context and that that should be its sole application. So if you look at the Rule 29 conference, that's the crux of the government's argument. That's at Joint Appendix, page 846. That's what they argued at the Rule 29. Since that time, this court has rejected that position in Halstead, in Cloud, and Abduwahab. So it should be no surprise that the transactions the government chose to prosecute as money laundering can't stand after those decisions. The government took an aggressive tact, tried to limit Santos to one particular context. But it seems to me we have consistently stuck with the notion that we focus on the expenses of the fraud and that we can take the product of the fraud as promotional money for a new fraud and that that is not going to be a merger problem. That's just a new fraud or money laundering. But it seems to me the whole focus has to be is what is the expenses of fraud, the conduct, the payments that led to support the fraud charge. Well, Judge Niemeyer, I think that narrows it. I think in this case the future transactions are to continue the fraud or to enter into new frauds. And I thought in Cloud especially we made it very clear that that type of promotional money laundering can be charged separately. I think that narrow conception isn't consistent with Abduwahab and maybe more importantly isn't consistent with Santos itself. As Judge Gibney pointed out, if you take a minute to think about the bookie that takes the bet in Santos. If you've got in Santos, you can't quite look there. You have to look at Justice Blackmun's opinion because it narrows it down very much. That's true. But Justice Stevens was still concerned about the merger problem. Stevens, yeah. Excuse me. That's okay. And the merger problem arose there, he said, both through the payments to runners and the debt collectors but also in paying the bet. All of those people were participants, the bookies, the runners, the commissions. It was all part of the initial expense of carrying out the fraud. There was another category. The other category is the key category, Judge Motz, and that's the winners of the scheme. The winners, yeah. The payments to the winners are very analogous to what we have here. The gambling scheme would have been in place. The bets were taken and the gambling crime was completed before those payments were paid. The government says, well, you're paying the investors here so that they can promote future fraud. That's exactly what you're doing when you pay the winners in a gambling scheme.  Actually, paying out the winners perpetuates the gambling scheme, and it was still considered by Judge Stevens to present a merger problem. So I think that's the strongest analogy here. I wanted to also take a minute sort of on the issue about whether this will somehow hamstring the government in prosecuting money laundering, and it won't, and there are a couple of reasons. The first is what Judge Motz pointed out. Congress has amended the statute in 2009, so for conduct from that point forward, we don't have to deal with the merger issue. Can we take that into account as a statement of congressional intent, and that's what Justice Stevens was so worried about was congressional intent. Now we know what this statute intends. Certainly for conduct from 2009 forward, yes. No, no, no. Backwards, no, absolutely. That would be an ex post facto issue big time. So, no, I don't think that we can say that Congress fixed it later and we should retroactively apply a broader statute. That's a huge ex post facto issue. But the other reason why finding a merger problem here won't hamstring the government is that in this type of two-year fraud scheme, there are tons of other transactions that could potentially form the basis for a money laundering conviction. I mean, if you look at the initial indictment in this case, before it was superseded, it alleged that a money laundering offense with respect to the purchase of a Lexus vehicle, that wouldn't present the merger problem that we have here. Now, the government may have other issues. Well, why wouldn't they charge that then? I thought you, when you gave your preliminary remarks, you said look at the way they originally charged and Fourth Circuit laws done them in. I think what happened is that they decided, I believe there was an unpublished Fourth Circuit opinion that came out at some point saying, you know, maybe Santos is only in the illegal gambling context or at least we're not going to extend it beyond that right now. And potentially seeing that opinion, the government decided to be more aggressive and to try to pursue that theory rather than, it was basically the path of least resistance. Because when you deal with a transaction that's not so essential, so core to the fraud scheme, it becomes more difficult to prove the other elements of the money laundering offense. So you avoid the merger problem, but the government would have bought itself some other difficulties. So that's why, you know, path of least resistance, let's limit Santos. Judge Moss, also another point you made about how these are inexpensive operating and how the fraud scheme fell apart quite quickly. You're right. If you look at the charts, you see that the last payouts from Black Diamond were made in July of 2009. That's Joint Appendix, page 1003. After that point, only two more payments came in. So word got out. This scheme had fallen apart. He wasn't meeting his obligations to make payouts. Nobody else invested. It shows in quite rapid succession how you go from the last payout to the last pay-in in the course of the month. It ended quite quickly. And now it took until December for it to completely unravel, but there were no pay-ins from August until December. I'm sorry. You said there were only two pay-ins after the last payout. Right. If you look at Joint Appendix 1003, the last payouts were July 29, 2009. After that, there were only two more investor deposits that came in for a total of $36,000. How many investors made more than one investment? I don't know the answer to that. A good number of them did. Both of the folks who were charging the money laundering accounts did. Mr. Bislucki made two, and Mr. Lux made several, probably. Total for $96,000, I believe it was spread around eight or ten separate investments, something along those lines. The Court has no other questions. Thank you for your time. Thank you, Mr. Carpenter.
judges: Paul V. Niemeyer, Diana Gribbon Motz, John A Gibney, Jr